Alan D. Smith, CSBA 89112
ADSmith@perkinscoie.com
Jeffrey S. Goodfried, CSBA 253804
JGoodfried@perkinscoie.com
PERKINS COIE LLP
1888 Century Park East, Suite 1700
Los Angeles, CA  90067
Telephone:  310.788.9900
Facsimile:  310.788.3399

Attorneys for U.S. Bank National Association,
as Trustee for the Registered Holders of
Wachovia Bank Commercial Mortgage Trust,
Commercial Mortgage Pass-Through
Certificates, Series 2004-C14

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re Summer View Sherman Oaks, LLC,<br><br>                Debtor. | CASE NO. 1:11-BK-19800-AA<br><br>Chapter Number: 11<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF U.S. BANK NATIONAL ASSOCIATION, ETC.'S MOTION FOR 11 U.S.C. § 543 (d)(1) RELIEF FROM TURNOVER OF PROPERTY (AND TO THE EXTENT NECESSARY RELIEF FROM AUTOMATIC STAY)**<br><br>[Filed concurrently with Motion for 11 U.S.C. § 543(d)(1) Relief from Turnover of Property; Declarations of Andrew Hundertmark and Jeffrey S. Goodfried in Support Thereof]<br><br>Date:     September 28, 2011<br>Time:    10:00 a.m.<br>Place:    Courtroom 303<br>           21041 Burbank Blvd.<br>           Woodland Hills, California<br><br>Before the Hon. Alan M. Ahart |

60642-0445.0001/LEGAL21622035.1

## I. Introduction.

By this Motion, U.S. Bank National Association, as Trustee for the Registered Holders of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2004-C14 ("U.S. Bank" or "Lender") seeks an order excusing compliance with turnover requirements of 11 U.S.C. § 543(a). The evidence provided below confirms that the Receiver (as defined below) appointed in the state court action has proceeded expeditiously and professionally to manage affairs of the debtor Summer View Sherman Oaks, LLC (the "Debtor"). Throughout the time period from December 2010 through April 2011, while the Debtor was still in control of the Property, it appears that over $300,000 has gone missing. Since the Receiver took control and possession of the Property, the income and expenses at the Property have been properly accounted for.

Putting the missing money aside, the Court should note that the Receiver has been substantially involved in managing the Property (as defined below) for months, including rent collection, default notices, touring and leasing activities, repairs, and maintenance. Indeed, the Debtor has already incurred transitional costs for the Receiver being put in place, including costs for filing an inventory, reviewing insurance coverage, arranging for new insurance policies, and arranging for turnover from the former management company, which was contentious despite there being a court order requiring such turnover.

Meanwhile, the Debtor offers no serious alternative to leaving the Receiver in place. If the Court denies this Motion, the Receiver and the management company will have to turn the Property over to the Debtor, who presumably will have to find yet another management company, and there will be yet more costs. One can only hope that the Debtor will do better at selecting management companies this time; one management company that the Debtor previously selected was later accused by the Debtor of having an employee that took rents and embezzled cash.

1    This 162-unit apartment complex in the heart of the San Fernando Valley needs to
2  be maintained by a well-respected, third party neutral with a proven track record.  In the
3  few months that the Receiver has had possession, he has increased occupancy and income
4  for the Property.  It is in the interest of creditors – and, indeed, of the Debtor itself – to
5  have the Receiver remain in place, given his early success with this Property.

**II.    Statement of Facts.**

**A.    The Loan Documents.**

On or about June 24, 2004, Wachovia Bank, National Association, a national banking association ("Wachovia") made a $16,000,000.00 loan (the "Loan") to SR Summer View Holdings, LLC, a Delaware limited liability company (the "Original Borrower").  See concurrently filed Declaration of Andrew Hundertmark ("Hundertmark Decl."), ¶ 2.  The Loan is secured by certain real property located in Los Angeles County at 15353 Weddington Street, Sherman Oaks, California 91411 (the "Property"), and more particularly described in Exhibit A attached to the Hundertmark Declaration.

The Loan is evidenced by, among other instruments, that certain Promissory Note (the "Note") dated June 24, 2004, executed by the Original Borrower in favor of Wachovia in the original principal sum of $16,000,000.00.  Furthermore, the Loan is secured by, among other things:  (i) that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing (the "Deed of Trust"), executed by the Original Borrower, as trustor, to First American Title Insurance Company, as trustee, for the benefit of Wachovia, as beneficiary; and (ii) that certain Assignment of Leases and Rents (the "Assignment of Rents") dated as of June 22, 2004, executed by the Original Borrower, as assignor, in favor of Wachovia, as assignee.  Hundertmark Decl., ¶ 3 & Exhs. B [Note], C [Deed of Trust], and D [Assignment of Rents].

The Deed of Trust encumbers the Property by a first priority lien as recorded in the Official Records of Los Angeles County, California (the "Official Records") on June 25, 2004, as Document No. 04 1630654.  The Assignment of Rents was recorded in the

1 | Official Records on June 25, 2004, as Document No. 04 1630655.  Hundertmark Decl.,
2 | ¶ 4.
3 |   The Note, the Deed of Trust, the Assignment of Rents, and all other documents
4 | evidencing, securing or relating to the Loan are sometimes collectively referred to herein
5 | as the "Loan Documents."
6 |   Wachovia assigned the Loan Documents to LaSalle Bank National Association, as
7 | Trustee for the registered holders of Wachovia Bank Commercial Mortgage Trust,
8 | Commercial Mortgage Pass-Through Certificates, Series 2004-C14 ("LaSalle") pursuant
9 | to: (i) that certain Assignment of Deed of Trust, Assignment of Leases and Rents,
10 | Security Agreement and Fixture Filing (the "LaSalle Assignment of Deed of Trust"),
11 | recorded in the Official Records on February 14, 2005, as Document No. 05 0339237; (ii)
12 | that certain Assignment of Assignment of Leases and Rents (the "LaSalle Assignment of
13 | Assignment of Rents"), recorded in the Official Records on February 14, 2005, as
14 | Document No. 05 0339238; and (iii) that certain Assignment of Note and Ancillary
15 | Security Documents (the "LaSalle Assignment of Ancillary Documents").  In addition,
16 | Wachovia endorsed the Note in favor of LaSalle pursuant to that certain Allonge (the
17 | "LaSalle Allonge").  Hundertmark Decl., ¶ 6 & Exhs. E [LaSalle Assignment of Deed of
18 | Trust], F [LaSalle Assignment of Assignment of Rents], G [LaSalle Assignment of
19 | Ancillary Documents], and H [LaSalle Allonge].
20 |   Effective as of July 18, 2005, debtor Summer View Sherman Oaks, LLC (the
21 | "Debtor") assumed the Loan, the Loan Documents and all of the Original Borrower's
22 | obligations therein pursuant to that certain Loan Assumption and Substitution Agreement
23 | (the "Assumption Agreement"), recorded in the Official Records on July 19, 2005, as
24 | Document No. 05 1697079.  Hundertmark Decl., ¶ 7 & Exh. I [Assumption Agreement].
25 |   Further, Bank of America, N.A., as Trustee, as successor by merger to LaSalle
26 | Bank National Association, as Trustee, for the registered holders of Wachovia Bank
27 | Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series
28 |

2004-C14[1] ("Bank of America") assigned the Loan Documents to U.S. Bank pursuant to: (i) that certain Assignment of Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing; Assignment of Assignment of Leases and Rents (the "U.S. Bank Assignment of Loan Documents"), recorded in the Official Records on April 15, 2011, as Document No. 2011-0546405; and (ii) that certain Omnibus Assignment (the "U.S. Bank Omnibus Assignment").  In addition, Bank of America endorsed the Note in favor of U.S. Bank pursuant to that certain Allonge (the "U.S. Bank Allonge"). Hundertmark Decl., ¶ 8 & Exhs. J [U.S. Bank Assignment of Loan Documents], K [U.S. Bank Omnibus Assignment], L [U.S. Bank Allonge].

Accordingly, U.S. Bank is now the holder of the Note, beneficiary under the Deed of Trust, and secured party and/or assignee under all of the other Loan Documents.

**B.    The Debtor's Default Under the Loan and Demand for Payment.**

Commencing in December 2010, and continuing to the present, the Debtor has failed to timely make its required monthly payments as and when required by the Loan Documents.  Hundertmark Decl., ¶ 12.

As of March 11, 2011, the Lender is owed in excess of $983,419.57 in principal, interest, tax and insurance escrows and reserves, default interest, late charges, title charges and other costs and expenses.  Further, due to the acceleration of the Loan, the total indebtedness on the Loan exceeding $19,833,233.83 is now due, owing, and unpaid, including a yield maintenance premium which would be due in accordance with the Loan Documents.  Hundertmark Decl., ¶ 15.

Due to the defaults under the Loan Documents, Lender commenced a non-judicial foreclosure on the Property by causing a Notice of Default to be recorded in the Official Records on March 17, 2011, as Document No. 2011-0406038.  Hundertmark Decl., ¶ 16 & Exh. N [Notice of Default].

---

[1] Effective October 17, 2008, LaSalle Bank National Association, which was the original trustee for the registered holders of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2004-C14, merged into and under the charter and title of Bank of America, N.A.

**C.    The appointment of the Receiver and Receiver's activities to date.**

On or about April 28, 2011, the Superior Court of California, County of Los Angeles, appointed on an *ex parte* basis (the "*Ex Parte* Order") Clyde Holland of Holland Residential (the "Receiver") to take possession of the Property. Hundertmark Decl., ¶ 18 & Exh. P [*Ex Parte* Order].

On or about May 24, 2011, after timely notice and opportunity to be heard, the Superior Court of California entered an Order confirming the appointment of the Receiver (the "Receiver Order"). Hundertmark Decl., ¶ 19 & Exh. Q [Receiver Order].

On or about May 4, 2011, the Receiver took possession (the "Turnover") of the Property and has thereafter managed the Property. The Receiver filed an inventory, reviewed existing insurance coverage, arranged for the insurance policies to name additional insured parties, and arranged for turnover from the former management company Mashcole Property Management of certain financial information and funds, which involved a contentious proceeding despite the state court's order to turnover the Property. See concurrently filed Declaration of Jeffrey Goodfried ("Goodfried Decl."), Exh. R [May Report].

Since taking possession of the Property, the Receiver has increased occupancy rates at the Property from 82.5% to 87.7%. Goodfried Decl., Exh. R [May Report] and Exh. T.

**D.    Facts to support relief from turnover of the Debtor's Property pursuant to 11 U.S.C. § 543.**

**1.    The Debtor diverted rents during the pre-receivership period.**

Throughout the time period from December 2010 through April 2011, the Debtor was still in control of the Property and obviously collecting rents from the Property. During that period, the Debtor did not make a single payment under the Loan Documents. The Loan Documents include an absolute assignment of rents, requiring a turnover of collected rents to the Lender – but the Debtor kept every penny of the net rents without

turning them over to the Lender as required. The economics relating to this Property therefore appear as follows:[2]

- The Property generates monthly rental income between $130,000 and $140,000.
- The Property's expenses are about $20,000 to $40,000 a month, not including property taxes and insurance (which do not tend to be paid on a monthly basis and in any event are supposed to be paid into reserves to be held by the Lender pending due dates).
- Therefore, about $100,000 a month should have been paid to the Lender from December 2010 to April 2011. This should total close to $500,000.
- However, the Lender did not receive any such payments during that time.
- At Turnover, the Debtor handed the Receiver cash in the amount of $182,250.
- So, it appears in excess of $300,000 is missing. It remains unclear where this money went, whether the Debtor still has any of the cash, or whether it has been spent on something else.[3]

**2.    Security deposits also seem to be missing.**

At Turnover, the Debtor (through its management company) turned over $39,470 in security deposits. Hundertmark Decl., ¶ 20. According to the Receiver's Security Deposit Liability Report, the Debtor collected pre-receivership about $68,840 in security deposits.[4] It is unclear where the nearly $30,000 in missing security deposit funds went.

---

[2] *See* Hundertmark Decl., ¶ 20.
[3] Due to the fact that the Receiver took possession of the Property a few days after May 1, 2011, he only recovered $51,345 in rental income for May 2011. Goodfried Decl., Exh. R. This means another $80,000 to $90,000 appears to be missing for May rent on top of the missing $300,000.
[4] This number is calculated by taking the total from the Security Deposit Liability Report ($74,988.41) and subtracting security deposits since May 4, 2011 ($6,150). Goodfried Decl., Exh. V [Security Deposit Report].

**3. The Debtor never questioned diminished cash flows that allegedly resulted from employee embezzlement at previous management company.**

The Debtor has suggested informally that the failure to make payments under the Loan Documents and the reason for its diminished cash flows was due to a dishonest individual working for the former management company. Although unfortunate if true, this does not explain why it took the Debtor months to notice the drop in cash flows. Putting that aside, it is unknown how much (if any) money was actually embezzled, or what the Debtor is doing to recover it. In any event, that there was some misfeasance does not justify the Debtor's failure to turn over the money that was in fact collected by the Debtor. As noted above, that cash remains unaccounted for as well.

### III. Discussion.

**A. Under 11 U.S.C. § 543(d)(1), this Court is authorized to allow the state court appointed receiver to continue to exercise possession, custody and control of the Debtor's property.**

After notice and a hearing, the Bankruptcy Court may excuse compliance with 11 U.S.C. § 543(a) – (c) if the interests of the creditors (and, if the debtor is not insolvent, equity security holders) would be better served by permitting the custodian to continue in possession, custody or control of estate property. 11 U.S.C. § 543(d)(1). A receiver expressly falls within the Bankruptcy Code's definition of custodian. *See* 11 U.S.C. § 101(11); *Matter of Cash Currency Exchange, Inc.*, 762 F.2d 542, 5553 (7th Cir. 1985) (state receiver who took possession of debtor's assets is a custodian under Section 543).

Bankruptcy Courts consider several factors when considering whether the interests of creditors and equity security holders would be better served by allowing a receiver to remain in place rather than turning over the debtor's property. Such factors include: (1) whether sufficient income exists to fund a successful reorganization; (2) whether the debtor will use the property for the benefit of its creditors; and (3) whether there has been mismanagement by the debtor. *See, e.g., In re Orchards Village Invs., LLC*, 405 B.R. 341 (Bankr. D. Or. 2009); *In re LCL Income Properties, L.P. VI*, 177 B.R. 872, 875 (Bankr. S.D. Ohio 1995).

In Chapter 11 cases, Courts will routinely excuse rents and profits receivers from turning over property to debtor upon commencement of a bankruptcy case where, among other things, there was previous mismanagement of the property. *See, e.g., In re Lizeric Realty Corp.*, 188 B.R. 499 (Bankr. S.D.N.Y.).

In this case, as discussed above, the Lender requests that the Court excuse the Receiver from turning over the Property based on three factors:

**(a)** *The money (which is cash collateral) has apparently been diverted from the Debtor's bank accounts*. The Debtor should have collected between $650,000 and $700,000 in rental income from December 2010 through April 2011. The expenses for the Property, other than property taxes and insurance (not generally paid by the Debtor directly, instead paid into a reserve held by the Lender) should be about $20,000 to $40,000 each month. That means over $500,000 should have been paid to the Lender during that five month period, or else that amount should have been left for turnover to the Receiver. But the Debtor ultimately only turned over $182,250 to the Receiver. There is no explanation as to the whereabouts of the missing money (something in excess of $300,000).

The third party, court-appointed Receiver should remain as custodian to ensure the rents stay accounted for during the bankruptcy proceedings. This extra supervision protects not only the Lender, but also all other creditors in this case, and indeed, the Debtor's estate and the Debtor's equityholders.

(b)    *Funds designated as security deposits are also missing.* While the Debtor turned over the security deposit account to the Receiver in the amount of $39,470, it appears the amount collected in security deposits from tenants as of May 4, 2011 was $68,840. There is no accounting for the missing $30,000 in security deposit funds. As above, a third-party court-appointed receiver should protect these funds. Tenants of the Property are entitled to these funds upon moving away from the Property. Tenants, as well as creditors and equityholders, will be better protected with a Receiver managing the deposits.

(c) ***The Debtor's lackadaisical approach to monitoring the cash flows should give pause to the Court putting it back into a fiduciary position to handle cash collateral***. Although the Debtor apparently blames its financial picture on alleged embezzlement, it seems highly unlikely that any such embezzlement can explain more than a small fraction of the missing funds. More significantly, the Debtor's purported explanation does not justify the Debtor's failure even to notice the missing funds and to do something about it months before the receivership. Did the Debtor not figure out that it had not paid the mortgage loan? Did the Debtor not notice that there was insufficient income to pay the loan?

Misfeasance on the part of an employee of the prior management company might explain a portion of the deficiency, but only a portion. It does not explain the Debtor's failure to manage the Property and supervise the retained manager. Retention of the court-appointed receiver would virtually guaranty such embezzlement will not occur again.

Meanwhile, the Receiver has proceeded expeditiously and professionally to manage the affairs of the Debtor and stabilize the operations at the Property. The Receiver's extensive experience managing apartment complexes is undisputed. The Receiver has directed the development or rehabilitation of 25,000 units and is approaching $5 billion in total transaction volume. Recent accomplishments include: GLO, a celebrated 200-unit mid-rise in Downtown Los Angeles; and Dexter Lake Union, a 201-unit mid-rise in Downtown Seattle. Goodfried Decl., Exh. U [State Court Holland Declaration].

As can be seen from the monthly reports from the Receiver, attached as exhibits to the Goodfried Declaration, in the few months since the Receiver has taken possession, the monthly rental income generated from the Property has increased; and the occupancy has increased. While there is still a ways to go before the Property is again functioning fully as it should, the chance of that happening is much greater under an experienced Receiver

and property manager, as contrasted to the Debtor and its historical performance. Again, creditors and equityholders will be better served by leaving the Receiver in place.

**B.  The maintenance and preservation of cash collateral is exceedingly vital here because Lender may be undersecured.**

Cash collateral provisions in the Bankruptcy Code protect a secured creditor by recognizing the unique nature of cash collateral, and the risk to the entity with an interest in such collateral, that arises from the dissipation or consumption of the collateral in a rehabilitative effort in bankruptcy. *Freighliner Mkt. Dev. Corp. v. Silver Wheel Freightlines, Inc.*, 823 F.2d 362, 368 (9th Cir. 1987). If the DIP fails to segregate and account for the cash collateral in its possession when the bankruptcy was filed, the secured creditor may be unable to establish the amount of its cash collateral or trace its proceeds. *Id.* Where the DIP fails to prove that cash collateral in its possession at the time the petition was filed was not used to acquire other assets or dissipated in the bankruptcy estate, the court may find the secured creditor has a security interest in all of the debtor's other liquid assets (e.g., pre-and postpetition accounts receivable). *Id.*, at 367-368.

The Lender is investigating whether it is oversecured or undersecured. If undersecured, the dissipation of any cash collateral will substantially harm Lender from recovering its full secured claim. In any event, "cash collateral" does not start at the filing of the bankruptcy. The missing $300,000 (which could easily be closer to $400,000 when considering the missing May 2011 rents) constitutes cash collateral, and the burden is on the Debtor to account for it.

The cash collateral issue and the relief sought by this Motion are, of course, interrelated. A competent property manager such as the Receiver will increase the net cash flow from the Property and thereby increase the value of the Property, thus benefiting all parties. Removing the Receiver and leaving the Property in the hands of the Debtor will likely mean the Property will remain a troubled asset, continuing to scrape by without the resources to make regular payments on its secured debt, and unable to

1  refinance or sell the Property at levels needed to pay off the secured debt.  To protect

2  Lender from future dissipation of cash collateral, and all other creditors and equityholders

3  in this case, the Court is respectfully requested to allow the Receiver to retain possession

4  of the Property and maintain control of the cash collateral.

## IV. Conclusion.

Based on the foregoing, Lender requests the Court grant the motion and excuse the Receiver from turning over the Property to the Debtor.

DATED: August 29, 2011.

PERKINS COIE LLP

By: __/s/ Alan D. Smith_____
    Alan D. Smith
    Jeffrey S. Goodfried
Attorneys for U.S. Bank National Association, as Trustee for the Registered Holders of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2004-C14

60642-0445.0001/LEGAL21622035.1